IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

Filed at 10:30 A.M
11/17 2006
DEPUTY CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA

WILLIAM MARK MIZE,

Petitioner

VS.

WILLIAM TERRY, Warden,

Respondent

CIVIL ACTION NO. 3:02-CV-110 (DF)

**ORDER**

Petitioner, an inmate on death row at the Georgia Diagnostic and Classification Prison in Jackson, Georgia, petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the following reasons, the Court denies Petitioner's request for relief.

## I. BACKGROUND

### A. Facts

The Supreme Court of Georgia summarized the facts in this case as follows:

> Viewed in the light most favorable to the verdict, the evidence adduced at trial showed that Mize was the leader of a small group, similar to the Ku Klux Klan, called the National Vastilian Aryan Party (NVAP). Witnesses testified that Mize made all the decisions for the NVAP. Several witnesses also testified that Mize displayed a single-shot 12-gauge shotgun at an NVAP meeting and told the members that the shotgun was the kind of weapon that the group would use because it could not be traced. Several of Mize's friends and co-workers were members of the NVAP, or in the initiation process. Eddie Tucker, the victim, had filled out an application form but was not a full member.
>
> On Saturday, October 15, 1994, several NVAP members and applicants gathered at Mize's home after Mize got off from work. Those present were Mize, Mark Allen, Chris Hattrup, Brian Dove, Samantha Doster (Mize's girl friend), and Tucker. Mize told Doster that the group was going camping that night and they all

got in Mize's car. When they were driving, Mize told the group that there was a crack house in Athens that he wanted "gotten rid of." Mize stated that he wanted Hattrup and Tucker to set the house on fire, and they stopped at a convenience store and bought a can of lighter fluid. Hattrup and Tucker were dropped off near the house but their attempt to set it on fire was unsuccessful. When they rejoined the group, Hattrup told Mize that he needed to talk with him. Hattrup also said, referring to Tucker, that they “didn't need anybody around that couldn't follow orders.”

After spending an hour at a bar, Mize drove the group to a wooded area in Oconee County. Dove and Doster were given camping gear to carry and the group set out into the woods. No one had a flashlight even though it was night. Tucker was in the lead, followed by Mize, Allen, Doster, Dove and Hattrup. After they had gone only a short distance, Hattrup passed Dove and Doster and moved up the trail to talk with Allen and Mize. Mize told Allen to stop Dove and Doster from continuing into the woods. At this point, Tucker, Hattrup and Mize were out of sight in the woods ahead of Allen, Dove and Doster. There was a shot, and Tucker exclaimed, “My God, what did you do that for?” There was a second shot. Doster heard Hattrup ask Mize if he had the gun and Mize replied, “No, man. I thought you had it.” Hattrup stated, “No. He took it away from me,” and Mize said, “If you can't finish it I can.” Allen left Dove and Doster and moved up the trail. Dove and Doster heard a discussion among Mize, Allen, and Hattrup about muscle spasms and how Tucker was still moving. There was a third shot.

Dove and Doster ran back to Mize's car. Mize emerged from the woods holding a shotgun and trying to break it down. Once in the car, Mize asked everyone if they knew why it was done. Everyone nodded in agreement. Mize told the group that the same thing could happen to them if they ran their mouth. Mize also told the group that, if asked about Tucker, they should say that they had dropped him off at a convenience store. While they were driving, Allen and Hattrup noticed that the barrel of the shotgun had shattered so they stopped at a bridge and threw the gun in a river. Later, Mize confided to Doster that he had finished Tucker off by shooting him in the head.

The police discovered Tucker's body several days later. He had been shot in the back, chest and head with a shotgun. The medical examiner testified that the back and chest wounds were inflicted by a shotgun fired at close range. The victim's head exhibited widely scattered pellet wounds that failed to penetrate the skull; the head wounds were consistent with a close-range shotgun blast that had shattered the barrel. The medical examiner further testified that the shots to the back and chest tore through the victim's right lung, but that none of the wounds were immediately fatal. The victim's death was due to blood loss, and it could have taken him several minutes to die. A fragment of the shotgun barrel was discovered about two feet from the body's location; the gun was not recovered.

After the body was discovered but before anyone was arrested, Chris Hattrup showed his roommate, Paul McDonald, the newspaper article about

> Tucker's death and told him what had happened. When the crack house failed to burn, Mize asked how Tucker had done and Hattrup responded that Tucker "didn't do what he was supposed to do." Mize then said, "you know what we have to do." Hattrup admitted to McDonald that he shot Tucker in the back and chest, but that Tucker was still alive. He was out of ammunition, though, so he asked Mize for another shotgun shell and Mize gave it to him. Hattrup then shot Tucker in the head. Hattrup also boasted to McDonald that he was now a "hit man for the Klan."
>
> Brian Dove told the police what he had seen and heard that night, and he later testified at Mize's trial. The other four NVAP members involved in Tucker's death were arrested. After spending a year in jail, Doster agreed to testify against the others and her charges were dropped.

***Mize v. State***, 269 Ga. 646, 646-48 (1998).

**B. Procedural History**

**1. State Court Proceedings**

Petitioner was indicted by the Oconee County Grand Jury on January 11, 1995 for the malice murder of William Eddie Tucker. (Resp't Ex. 23, p. 1-2). The State filed a notice of intent to seek the death penalty on March 29, 1995. (Resp't Ex. 23, p. 13-14). Following a jury trial held on December 4-13, 1995, the jury convicted Petitioner and sentenced him to death. (Resp't Ex. 23, p. 391, 406; Resp't Ex. 14, p. 2398).

Petitioner filed a motion for new trial on January 14, 1996, and an amended motion for a new trial on May 20, 1996. (Resp't Ex. 23, p. 420-21, 442-85). The Superior Court of Oconee County denied the motion for new trial, as amended, on August 22, 1996. (Resp't Ex. 23, p. 486-94).

Petitioner filed a notice of appeal to the Supreme Court of Georgia. (Resp't Ex. 23, p. 493). The Supreme Court of Georgia struck Petitioner's initial appeal and remanded the case back to the superior court for appointment of appellate counsel. (Resp't Ex. 23, p. 518, 524-27). The court appointed Palmer Singleton and Mr. Singleton filed a motion for a new trial on March 3, 1997. (Resp't Ex. 23, p. 524-27). An amended motion for a new trial was filed on June 30, 1997,

and supplemented on August 4, 1997. (Resp't Ex. 23, p. 539–616; 625-48). On October 2, 1997, the Superior Court of Oconee County entered an order denying Petitioner's motion for a new trial. (Resp't Ex. 23, p. 663-76).

Petitioner filed a notice of appeal on October 31, 1997. (Resp't Ex. 23, p. 678-81). The Supreme Court of Georgia affirmed Petitioner's conviction and sentence on June 15, 1998. ***Mize v. State***, 269 Ga. 646 (1998). Petitioner's motion for reconsideration was denied on July 30, 1998. (Resp't Ex. 30).

Petitioner filed a *pro se* petition for writ of certiorari in the United States Supreme Court on November 3, 1998. (Resp't Ex. 31). The Supreme Court of the United States denied the petition on January 11, 1999. (Resp't Ex. 33).

Petitioner, with the assistance of attorney John Matteson, filed his first state habeas corpus petition (Civil Action No. 99-V-155) in the Butts County Superior Court on March 3, 1999. (Resp't Ex. 37, p. 116). It appears that Petitioner then decided to discharge Mr. Matteson and, acting *pro se*, Petitioner filed a second habeas petition (Civil Action No. 99-V-205) on March 19, 1999, along with letters to the court stating that no further filings from Mr. Matteson were to be accepted. (Resp't Ex. 37, p. 116-134). Petitioner requested that Mr. Mattson cease all representation and withdraw the habeas corpus petition that he filed on March 3, 1999. (Resp't Ex. 37, p. 131-37). On April 8, 1999, Mr. Matteson complied with Petitioner's request and filed a notice of dismissal requesting that the court dismiss Civil Action No. 99-V-155 without prejudice. (Resp't Ex. 37, p. 137).

Petitioner then informed the court that he wished to be represented by Bruce Harvey and Mr. Harvey filed a motion seeking to reinstate and consolidate Petitioner's prior habeas corpus petitions. (Resp't Ex. 37, p. 1140-145). Subsequently, Petitioner notified the court that Mr.

Harvey no longer represented him, he wished to proceed *pro se*, and he wished to withdraw his habeas petition. (Resp't Ex. 37, p. 168-69, 172, 200). On October 27, 1999, the court allowed Petitioner to voluntarily dismiss his habeas corpus petition. (Resp't Ex. 37, p. 267-68),

Petitioner filed a third habeas corpus petition on December 28, 1999. (Resp't Ex. 37, p. 39). Again, Petitioner continually asserted his *pro se* status; although Thomas Dunn from the Georgia Resource Center attended all of the hearings and assisted Petitioner. (Resp't Ex. 37, p. 39, 46-48, 269, 279-94, 309-315, 317-19, 418-20; Resp't Ex. 50, 51). The Court held several hearings and at the close of the February 1, 2001 evidentiary hearing, the court stated that it would reserve ruling until the Superior Court of Oconee County ruled on an extraordinary motion for new trial that Petitioner filed *pro se* in July 2000. (Resp't Ex. 37, p. 271-78, 320-37).

In the July 2000 extraordinary motion for new trial, Petitioner attached numerous affidavits and asserted that newly discovered evidence warranted a new trial. (Resp't Ex. 37, p. 271-272). The Oconee County Superior Court ordered that Petitioner be granted a hearing limited solely to the issue of prosecutorial misconduct with respect to the alleged knowing use of perjured testimony by the District Attorney as claimed in the June 15, 2000 affidavit of Mary Samantha Doster. (Resp't Ex. 37, p. 410-17). In this same Order, the court denied relief on all other claims. (Resp't Ex. 37). Petitioner, through his then attorney of record, John Matteson, withdrew the extraordinary motion for new trial on July 5, 2001. (Resp't Ex. 38-41). The Court entered an order dated July 9, 2001 cancelling the July 10, 2001 hearing due to Petitioner's withdrawal of his extraordinary motion for new trial. (Resp't Ex. 41).

Six months later, the Butts County Superior Court ruled on the pending habeas corpus action and denied relief. (Resp't Ex. 42).

On January 28, 2002, Petitioner filed an application for a certificate of probable cause to

appeal in the Georgia Supreme Court. (Resp't Ex. 43). The petition was denied on July 15, 2002. (Resp't Ex. 45). Petitioner's motion for reconsideration from the denial of his application for a certificate of probable cause to appeal filed in the Supreme of Georgia was denied on September 16, 2002. (Resp't Ex. 47).

**2. Federal Habeas Corpus Proceedings**

Petitioner filed a *pro se* Application for Habeas Corpus under 28 U.S.C. § 2254 in this Court on October 31, 2002. (R. at 2). Pursuant to Petitioner's motion, the Court appointed counsel and counsel filed an amended petition on July 21, 2003. (R. at 3, 10, 19).

Following appointment of counsel, Petitioner filed numerous motions in which he complained about his appointed attorneys. (R. at 23, 26, 28, 38, 44, 45, 46, 47, 48). The Court held its first hearing on December 3, 2003 in order to discuss Petitioner's concerns regarding his attorneys. Petitioner was allowed to testify at this hearing. (R. at 37). Following the hearing, the Court issued its January 15, 2004 Order in which it denied Petitioner's *pro se* motion to substitute counsel; denied his *pro se* motion to allow an amended habeas corpus petition; and denied his *pro se* motion to hold this federal habeas corpus action in abeyance. (R. at 35).

Petitioner continued to file motions in which he complained of his representation and eventually filed a motion to dismiss his federal habeas corpus action. (R. at 48). The Court held a second hearing on May 26, 2004 to determine if Petitioner did wish to dismiss this action; and to explain the consequences of such a dismissal. (R. at 53). Following this hearing, the Court issued its June 3, 2004 Order in which it denied all of Petitioner's outstanding *pro se* motions; including his motion dismiss his federal habeas corpus action. (R. at 45, 46, 47, 48, 54).

Following this, Petitioner filed another motion to proceed *pro se* and requested that all documents filed by his appointed attorneys be withdrawn. (R. at 59). In an Order dated September

21, 2004, the Court informed Petitioner that he did have a right to waive his statutory right to counsel. (R. at 60). However, the Court found that prior to granting Petitioner's request, it should have an expert examine Petitioner to make sure that he was competent to dismiss his attorneys and proceed *pro se* in this action. (R. at 60).

The parties agreed on an expert and this expert found Petitioner competent to make decisions in his case. (R. at 62). However, Petitioner then informed the Court that he no longer wished to proceed *pro se* and dismiss his amended habeas petition. (R. at 67).

Petitioner's appointed attorneys remained in this case and filed, pursuant to ***Rhines v. Weber***, 544 U.S. 269 (2005), a Motion to Hold Proceedings in Abeyance Pending Exhaustion. (R. at 69). In this motion, Petitioner requested that this Court hold the proceedings in abeyance while he exhausted Claim Two[1] of his federal habeas corpus petition in the state courts. In an Order dated July 29, 2005, the Court held that it could not hold the federal proceedings in abeyance because Petitioner could not show good cause for his failure to litigate this claim during one of his three previous state habeas corpus actions. (R. at 72). Thereafter, during the pendency of this federal habeas corpus action, Petitioner attempted to exhaust Claim Two contained in his federal habeas corpus petition by filing a fourth state habeas petition in the Butts County Superior Court. (Resp't Ex. 53). The state court found the claim was procedurally defaulted and dismissed Petitioner's fourth state habeas action as successive. (Resp't Ex. 55). Petitioner filed a notice of appeal and an Application for a Certificate of Probable Cause asking the Supreme Court of Georgia to review the Butts County Superior Court's Order. (Resp't Ex. 61, 62). The Georgia

---

[1]Claim Two contained in Petitioner's federal habeas corpus action reads as follows: "Petitioner's right to due process, protected by the Fifth and Fourteenth Amendments to the United States Constitution, was violated when the State's key witness lied at trial about facts critical to the jury's determination of guilt."

Supreme Court subsequently denied Petitioner's Application for Certificate of Probable Cause. (Resp't Ex. 64).

Regarding discovery and an evidentiary hearing, Petitioner filed a notice that waived any formal discovery provided by Rule 6 of the Habeas Corpus Rules and, in an Order dated December 12, 2005, the Court denied Petitioner's motion requesting an evidentiary hearing. (R. at 43, 79).

In an Order dated March 15, 2006, the Court found that Petitioner had procedurally defaulted Claims Two and Five; and had abandoned Claim Six. (R. at 83).

Petitioner and Respondent have now briefed the remaining claims and the Court addresses these below.

## II. DISCUSSION

### A. Standard of Review

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). As the United States Court of Appeals for the Eleventh Circuit has explained, AEDPA "'establishes a highly deferential standard for reviewing state court judgments'." ***McNair v. Campbell***, 416 F.3d 1291, 1297 (11th Cir. 2005)(quoting ***Parker v. Sec'y for Dep't of Corr.***, 331 F.3d 764, 768 (11th Cir. 2003)). Pursuant to AEDPA, when a state court has adjudicated a habeas petitioner's claim on the merits, a federal district court can grant relief only if the state court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254 (d).

In ***Williams v. Taylor***, 529 U.S. 362 (2000), the Supreme Court of the United States

explained the meaning of "contrary to" as it is used in § 2254 (d)(1). The Court held that "[a] state-court decision is contrary to th[e] [Supreme] Court's precedent if the state court arrives at a conclusion opposite to that reached by th[e] Supreme Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]."[2] ***Williams,*** 529 U.S. at 405. In contrast, "[a] state court's decision that applies the law as determined by the Supreme Court to the facts is not 'contrary to' whether or not the federal court would have reached a different result." ***Carr v. Schofield***, 364 F.3d 1246, 1250 (11th Cir. 2004)(quoting ***Fugate v. Head***, 261 F.3d 1206, 1216 (11th Cir. 2001), ***cert. denied*** 535 U.S. 1104 (2002)). A federal district court cannot substitute its opinion for that of the state court. Moreover, in situations in which there is no Supreme Court precedent on point, "'the court cannot say that the state court's conclusion . . . is contrary to clearly established federal law as determined by the United States.'" ***Henderson v. Haley***, 353 F.3d 880, 890 (11th Cir. 2003)(quoting ***Isaacs v. Head***, 300 F.3d 1232, 1252 (11th Cir. 2002)).

There are two ways in which a state court decision may be an "unreasonable application of clearly established Federal law." 28 U.S.C. § 2254 (d)(1). "A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision 'involving an unreasonable application of . . . clearly established Federal law'." ***Williams***, 529 U.S. at 407-408 (quoting 28 U.S.C. § 2254 (d)(1)). Additionally, "[t]he state court's decision is an objectively 'unreasonable application' if it

---

[2]The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." ***Williams***, 529 U.S. at 412.

'identifies the correct governing [Supreme Court] legal principle . . . but . . .'refuses to extend the governing principle to a context in which the principle should have controlled'." ***Carr***, 364 F.3d at 1250 (quoting ***Ramdass v. Angelone***, 530 U.S. 156, 166 (2000)). When attempting to determine if the state court's decision involved an unreasonable application of federal law, the federal district court need not decide if it "would have reached the same result as the state court if [it] had been deciding the issue in the first instance." ***Wright v. Secretary for the Dep't of Corr.***, 278 F.3d 1245, 1256 (11th Cir. 2002). Instead, the court merely "should ask whether the state court's application of clearly established federal law was objectively unreasonable." ***Williams***, 529 U.S. at 409.

In addition to the two narrow "contrary to" and "unreasonable application of" prongs of AEDPA, a petitioner is also entitled to relief if the state court's conclusion is based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254 (d)(2). However, this Court's "review of a state court's judgment . . . is governed by a 'highly deferential standard of review for factual determinations made by a state court'." ***Carr***, 364 F.3d at 1250 (quoting ***Fugate***, 261 F.3d at 1215). A state court's factual findings are presumed correct unless rebutted by clear and convincing evidence. ***McNair***, 416 F.3d at 1309 (citing 28 U.S.C. § 2254 e)(1)). Furthermore, this Court must give deference to the state court's determinations regarding credibility. ***Baldwin v. Johnson***, 152 F.3d 1304, 1317 (11th Cir. 1998).

**B. Petitioner's Specific Claims**

**1. Claim One: Petitioner's right to due process, protected by the Fifth and**

**Fourteenth Amendments to the United States Constitution, was violated with the Assistant District Attorney engaged in prosecutorial misconduct by withholding exculpatory evidence.**

This claim involves the State's failure to turn over notes taken during a pre-trial interview of Samantha Doster. During the hearing regarding petitioner's motion for a new trial, there was testimony that the District Attorney conducted a pre-trial interview of Samantha Doster and took notes during such interview. (Resp't Ex. 18, p. 70). During a later hearing on this same motion, Ms. Doster produced a six-page document that was characterized as pretrial notes typed by Assistant District Attorney Gerald Brown; with written changes/edits by District Attorney Harry Gordon. (Resp't Ex. 20, p. 106, 112-113, 117). Apparently these six pages were given to Samantha Doster prior to trial. (Resp't Ex. 20, p. 117).

On direct appeal to the Georgia Supreme Court, petitioner argued that the State violated ***Brady v. Maryland***, 373 U.S. 83 (1963) by failing to turn over these notes. The Georgia Supreme Court ruled as follows:

> Mize claims that the State withheld exculpatory information in violation of ***Brady v. Maryland***, 373 U.S. 83 . . . (1963). Specifically, he asserts that the State had written notes from a pre-trial interview with Samantha Doster that contained exculpatory information not revealed to the defense . . . . [This] contention[] [is] without merit. First, the notes from the interview with Doster were not exculpatory. The notes were created after Doster agreed to testify for the State: a prosecutor spoke with her and jotted down about six pages of notes in bullet format. These notes contained the following information: Mize was the leader of the NVAP, Mize told Allen to stop Dove and Doster from going deeper into the woods, Mize returned to the car with the gun, Mize gave everyone a story to tell if anyone asked about Tucker, and Mize admitted to finishing off the victim. Mize claims that he could have impeached Doster with the notes because the notes imply that Mize fired the first two shots while Doster's trial testimony implied (based on the conversation between Hattrup and Mize in the woods) that Hattrup had fired the first two shots. In order to prevail on a ***Brady*** claim, Mize must show:
>
> that the State possessed evidence favorable to the defendant; the defendant did not

> possess the evidence nor could he obtain it himself with any reasonable diligence; the prosecution suppressed the favorable evidence; and had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceeding would have been different.
>
> ***Burgeson v. State***, 267 Ga. 102 (2). . . (1996). The notes were not favorable to the defense because they unequivocally stated that Mize participated in Tucker's murder. In addition, Mize claims that the notes revealed that Doster had used drugs on the night of the murder and that this information could have been used to impeach her recollection of events. The notes, however, only state that Doster had used drugs on some night prior to the night of the murder, and Doster readily admitted her past drug abuse at trial. We find no ***Brady*** error with regard to the State's notes of the interview with Samantha Doster.

***Mize***, 269 Ga. at 648-49.

Petitioner states that the Georgia Supreme Court's conclusion that the notes did not contain exculpatory material resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented. First, Petitioner states that "[i]t is a significant error of fact for the Supreme Court to have found that the document was 'jotted down' notes when the six-page document was typewritten, reviewed, edited, and amended." (Pet'r May 15, 2006 Br., p. 9).

It is clear that the Georgia Supreme Court reviewed the six-page document at issue. The fact that the court characterized the notes as "jotted down" as opposed to "typewritten with corrections and edits" had nothing to do with the court's ultimate rejection of Petitioner's ***Brady*** claim. Pursuant to 28 U.S.C. § 2254, it is only when a state court's decision is " **based on** an unreasonable determination of the fact," that this Court can grant habeas relief. ***Id***. (emphasis added). The state court's rejection of Petitioner's ***Brady*** claim was not "based on" any factual finding that the notes were "jotted down"; it was based on the Court's finding that the notes were not exculpatory.

Next, Petitioner states that the Georgia Supreme Court erroneously failed to make a finding of fact that included the exculpatory portions of the document. Specifically, Petitioner faults the state court for not specifically pointing out that in her pre-trial interview Ms. Doster stated she heard "someone say that if you cannot do it I can." (Resp't Ex. 22, p. 873). Whereas, at trial, Ms. Doster stated that she heard Mark Mize say "Well, if you can't finish it I can." (Res't Ex. 13, p. 2147). Petitioner states that "the use of the indeterminate pronoun 'someone' makes clear, prior to trial, Samantha Doster had no idea who said 'if you cannot do it I can'." (Pet'r May 15, 2006 Br., p. 11).

However, Petitioner overlooks the fact during this same pre-trial interview, not more than eight lines from when Ms. Doster states she heard "someone say if you cannot do it I can," she states that "[l]ater Mize told her that I finished it." (Resp't Ex. 22, p. 873). This Court's review of the state court's decision "is governed by a 'highly deferential standard of review for factual determinations made by a state court'." ***Carr***, 364 F.3d at 1250 (quoting ***Fugate***, 261 F.3d at 1215). Applying this deference, the Court cannot say that the Geogia Supreme Court based their decision on an unreasonable determination of the facts simply because the state court did not include every point of the pre-trial interview in their statement regarding why the notes were not ***Brady*** material.

Next, petitioner states that "[t]he legal conclusion that the suppression of the notes from the defense was not a violation of ***Brady*** and its progeny because the suppressed evidence also contained inculpatory evidence is contrary to the applicable and clearly established Supreme Court precedent." (Pet'r May 15, 2006 Br., p. 11). As an initial matter, the Court notes that the Georgia

Supreme Court "did not apply a rule that contradicts governing Supreme Court case law." ***Muharaj v. Secretary for the Dep't of Corr.***, 432 F.3d 1292, 1312 (11th Cir. 2005). Instead, it applied ***Brady v. Maryland***, 373 U.S. 83 (1963). Therefore, the court's opinion is not "contrary to" ***Brady***. ***See Fugate v. Head***, 261 F.3d 1206, 1216 (11th Cir. 2001)(explaining that "a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law").

Additionally, the state court did not rule that evidence which includes both inculpatory and exculpatory portions does not fall within the parameters of ***Brady***. Instead, it is apparent that Petitioner made the same argument at the state level that he makes now; i.e., he could have impeached Samantha Doster with information contained in the notes. (Resp't Ex. 25, p. 23-34). The court obviously reviewed this argument, reviewed the six pages of pre-trial notes; discussed the notes' impeachment value (or lack thereof); applied ***Brady***; and ruled that it "found no ***Brady*** error with regard to the State's notes of the interview with Samantha Doster." ***Mize***, 269 Ga. at 649. No where in its opinion did the Georgia Supreme Court state that evidence containing both inculpatory and exculpatory elements is not covered by ***Brady***. Instead, it applied ***Brady*** and ruled that the pre-trial notes simply were not exculpatory. Given this, the Court finds that the Georgia Supreme Court's analysis under ***Brady*** was neither contrary to, nor an unreasonable application of, clearly established federal law.

**2. Claim Three: Petitioner's right to due process, protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, was violated when the state court failed to reverse Mize's conviction because the actual shooter, who was the**

**one person directly responsible for Eddie Tucker's death, admitted so in various sworn statements after Mize's trial.**

In Claim Three of his federal habeas petition, Petitioner claims that the state court should have relied upon Chris Hattrups' post-trial testimony (which was given during Hattrup's guilty plea, placed in two affidavits, and provided during the evidentiary hearing in support of petitioner's Motion for New Trial) and reversed Petitioner's conviction. After an examination of the record, the Court notes that there is a question regarding whether Claim Three is exhausted or procedurally defaulted. Both parties have addressed this issue in their briefs. (R. at 89, 90).

It appears that Petitioner first raised this issue in his Amended Motion for New Trial; to which Petitioner attached Chris Hattrup's May 1, 1996 Affidavit and transcript from Hattrup's guilty plea. (Res't Ex. 23, p. 452-85). The Oconee County Superior court held a hearing regarding issues presented in the Amended Motion for New Trial, and Chris Hattrup, as well as Mr. Hattrup's attorney, provided testimony. (Resp't Ex. 18). In its order denying Petitioner's Amended Motion for a New Trial, the court explained that "[n]ot only is Hattrup's affidavit inherently unreliable, but upon consideration of the conflicts in his testimony and that of his attorney the Court simply finds that Hattrup's statements are not believable." (Resp't Ex. 23, p. 491). .

In his direct appeal to the Georgia Supreme Court, Petitioner claimed that his trial counsel was ineffective for failing to present evidence of Hattrup's admission of liability. However, in his direct appeal, Petitioner did not raise the claim that he raises now in Claim Three of his federal habeas petition: that Petitioner's right to due process, protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, was violated when

the state court failed to reverse Petitioner's conviction because the actual shooter, who was the one person directly responsible for Eddie Tucker's death, admitted so in various sworn statements after Mize's trial.

Following direct appeal, Petitioner filed numerous state habeas actions, and in Ground Two of his December 21, 1999 state habeas petition, Petitioner did assert "actual innocence" based on Chris Hattrup's affidavit testimony and attached Mr. Hattrup's May 1, 1996 affidavit. (Resp't Ex. 34). The state habeas court held as follows:

> Petitioner alleges in Ground Two that he is actually innocent. However, "[i]t is not the function of the writ of habeas corpus to determine the guilt or innocence of one accused of a crime." **Duyton v. Wanzer**, 240 Ga. 509, 510, 241 S.E.2d 228 (1978). Accordingly, this issue is not properly before this Habeas Court.
>
> Further, this Court notes that the issue of actual innocence was previously raised at Petitioner's motion for new trial and rejected by the trial court.[3]

(Resp't Ex 42).

Petitioner filed an Application for Certificate of Probable Cause to appeal to the Supreme Court of Georgia. (Resp't Ex. 43). In this application, Petitioner alleged that the state habeas court's ruling regarding his "actual innocence" claim was incorrect. (Resp't Ex. 43, p. 5). The Supreme Court of Georgia denied Petitioner's Application for Certificate of Probable Cause

During the pendency of this state habeas action, Petitioner also filed an Extraordinary Motion for New Trial in the Oconee County Superior Court; in which he claimed actual innocence and attached, among other things, a copy of an affidavit signed by Chris Hattrup dated August 17, 2000. (Resp't Ex. 37, p. 320-23, Resp't Ex. 36). The Court denied Petitioner's motion on this

---

[3]Note that the state habeas court did not find that the issue had been raised during appeal to the Georgia Supreme Court.

ground. (Resp't Ex. 36, p. 414). Petitioner did not appeal this ruling.

Petitioner argues that he exhausted Claim Three of his federal habeas petition when he raised the issue as part of his ineffective assistance of counsel claim on direct appeal. (Pet'r May 15, 2006 Br., p. 21). However, Petitioner is not now raising this issue as part of his ineffective assistance of counsel claim. Instead, Petitioner is now alleging that his right to due process was violated when the state court failed to reverse his conviction after Chris Hattrup provided his post-trial testimony. This is a separate and distinct claim from his ineffective assistance claim. A federal habeas petition must fairly present a claim to the state court prior to presenting it to the federal court. In order to fairly present a claim, "a state prisoner [must] present the state courts with the **same** claim he urges upon the federal courts." ***Picard v. Connor***, 404 U.S. 270, 275 (1971)(emphasis added). As Claim Three in the federal habeas petition is not the same as that presented in the direct appeal, Petitioner did not exhaust this issue on direct appeal.[4]

Petitioner also argues that he exhausted this claim when he raised the issue in his state habeas petition and then sought to appeal the issue in his Application for Certificate of Probable Cause to appeal to the Supreme Court of Georgia. (Resp't Exs. 42, 43). However, it does not appear that the state habeas court was the appropriate court in which to present the claim. The state habeas court held that "this issue is not properly before this Habeas Court." (Resp't Ex 42). In order to exhaust a claim, it must be presented to the appropriate court that can make a ruling on the merits. ***See generally Castille v. Peoples***, 489 U.S. 346 (1989)(exhaustion occurs when claim

---

[4]Furthermore, it appears that on direct appeal Petitioner alleged that trial counsel was ineffective because he did not present Chris Hattrup's **pre-trial** statements to attempt to show that Hattrup was solely responsible for the murder. On direct appeal, Petitioner made no allegations regarding the **post-trial** affidavits and statements of Chris Hattrup.

is presented in a proceeding in which it deserves a ruling on merits as a matter of right); ***Baldwin v. Reese***, 541 U.S. 27 (2004) (explaining that "[t]o provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each **appropriate** state court")(emphasis added).

Finally, although Petitioner did raise the claim in his Motion for New Trial and Extraordinary Motion for New Trial, it does not appear that he appealed the superior court's denial of this claim. Therefore, Petitioner did not exhaust this claim by raising it in these two motions. ***Pruitt v. Jones***, 348 F.3d 1355, 1358-59 (11th Cir. 2003)(explaining that a petitioner must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process; which includes review by the state's court of last resort, even if review in that court is discretionary).

Not only does it appear that Petitioner failed to exhaust his claim when he had the chance, it is also apparent that Petitioner would be barred from raising this claim in the state courts at this time. ***See*** O.C.G.A. §5-6-38; O.C.G.A. § 9-14-48; ***Black v. Hardin***, 255 Ga. 239 (1985). Therefore, this Court must treat the unexhausted claim as procedurally defaulted. ***See Baldwin v. Reese***, 541 U.S. 27 (2004); ***Snowden v. Singletary***, 135 F.3d 732, 736 (11th Cir. 1998); ***Putman v. Turpin***, 53 F. Supp. 2d 1285, 1292 (M.D. Ga. 1999), ***aff'd***, 268 F.3d 223 (11th Cir. 2001) (explaining that "when it is clear that the unexhausted claims would be barred in state court due to a state law procedural default, federal courts 'can . . . treat those claims now barred by state law as no basis for federal habeas relief'") (quoting ***Snowden***, 135 F.2d at 735). Furthermore, Petitioner has not shown any excuse to overcome the procedural bar.

However, even if this Claim Three of his federal habeas petition was not procedurally

barred, the claim would still fail. Petitioner claims that Chris Hattrup's later testimony and affidavits establish his "actual innocence." (Pet'r May 15, 2006 Br., p. 20). In a recent case, the United States Supreme Court refused to decide whether a freestanding innocence claims is possible in a federal habeas action. ***House v. Bell***,126 S. Ct. 2064, 2086-87 (2006). However the Court did reiterate that "the threshhold for any hypothetical freestanding innocence claim [is] 'extraordinarily high'." ***Id.*** at 2087 (quoting ***Herrera v. Collins***, 506 U.S. 390, 417 (1993). Considering the number of times Chris Hattrup has changed his story,[5] along with all of the other

---

[5]At Petitioner's trial, Chris "Hattrup, through his attorney, invoked his Fifth Amendment right to silence." (Pet'r May 15, 2006 Br., p. 22). During Chris Hattrup's April 5, 1996 guilty plea, he testified that he fired only one of the three shots. (Resp't Ex. 23, p. 469). Mr. Hattrup testified that he did not know why he shot the victim. (Resp't Ex. 23, p. 469, 472). In his May 1, 1996 affidavit, Chris Hattrup averred as follows: "I shot Eddie Tucker. I was drunk at the time and I do not know why I shot him, but I fired the first shot and I may have fired the second shot. I did not fire the third shot, but I do not know who fired that shot." (Resp't Ex. 23, p. 453). He also stated that no one ordered him or told him to kill the victim. (Resp't Ex. 23, p. 453). At the May 30, 1996 hearing regarding Petitioner's Amended Motion for New Trial, Mr. Hattrup testified that he was not ordered to shoot Eddie Tucker and he may have fired all three shots. (Resp't Ex. 18, p. 33). Furthermore, Mr. Hattrup testified that the did not know "who was around when Eddie Tucker got killed." (Res't Ex. 18, p. 37-38). Chris Hattrup testified that was not sure if Petitioner was with him at the time of the shooting or nor. (Resp't Ex. 18, p. 38). Furthermore, Mr. Hattrup explained that he did not know if Petitioner shot Eddie Tucker. (Resp't Ex. 18, p. 38). At this same hearing, Chris Hattrup's attorney testified that "Chris has steadfastly taken a position that he did not fire the third shot." (Resp't Ex. 18, p. 52). Furthermore, his attorney testified that Mr. Hattrup had "indicated on a number of occasions that he has a kind of vague recollection that someone told him after the first shot to either fire the second shot or to say something along the lines of go ahead, shoot him." (Resp't Ex. 18, p. 53). Finally, in his most recent August 17, 2000 affidavit, Chris Hattrup again changed his story. He stated that Petitioner was definitely not with him when he shot Eddie Tucker and that Petitioner was "shocked and angry" after Mr. Hattrup shot Mr. Tucker. (Resp't Ex. 66). Contrary to his earlier testimony, Chris Hattrup stated that "I know that I shot Eddie Tucker all three times." (Resp't Ex. 66). Given all of this contradictory testimony, Petitioner certainly has not shown that the state court's factual finding–that Hattrup's affidavit was "inherently unreliable" and his statements "not believable"–are incorrect. Furthermore, due to the number of times Mr. Hattrup has changed his story, it certainly cannot be said that all of his contradictory testimony presents "a truly persuasive demonstration of [Petitioner's] actual

evidence, Petitioner's showing falls far "short of the threshold implied in ***Herrera***." ***Id.***

**3. Claim Four: Petitioner was denied effective assistance of trial counsel, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, when trial counsel failed to conduct an adequate pretrial investigation and presentation at trial concerning an alleged shotgun fragment, which the state claimed was discovered at the scene of the crime.**

On direct appeal Petitioner argued that his trial counsel was ineffective due to the following:

> The defense did not take independent or adequate steps through pretrial investigation to learn who actually operated the [metal detector] and to learn his or her version of the October 20th events. In addition, in the course of the trial when prosecution crime scene witnesses testified to the use of the detector on the 20th, the defense did not pursue cross-examination concerning the identity of the operator. . . . Nor did the defense seek a continuance at the point in the trial when crime scene officers testified that it was someone other than themselves who actually used the metal detector. These omissions deprived the defense of critical exculpatory evidence that would have undermined one mainstay of the government's case.

(Resp't Ex. 25, p. 88-89).

The Georgia Supreme Court held as follows:

> Mize's trial counsel was not ineffective under Strickland v. Washington, 466 U.S. 668 . . . (1984). "In order to establish that trial counsel's performance was so defective as to require a new trial, [Mize] must show that counsel's performance was deficient and that the deficient performance so prejudiced [Mize] that there is a reasonable likelihood that, absent counsel's errors, the outcome of the trial would have been different." Roberts v. State, 263 Ga. 807 (2) . . . (1994). There is a strong presumption that counsel's conduct fell within a broad range of reasonable professional conduct. Id. The record reveals that Mize's counsel attempted to minimize Mize's involvement in the murder through evidence that Hattrup had fired all three shots, and counsel attempted to show that the police had not been thorough in their investigation. Mize's counsel's performance was not deficient because these are reasonable strategic decisions. See Strickland, supra at 690-691.

***Mize***, 269 Ga. at 654-55.

---

innocence." ***House***, 126 S. Ct. at 2086.

Petitioner complains that the Georgia Supreme Court failed to provide specific facts to support its conclusion that counsel was not ineffective. However, the Eleventh Circuit Court of Appeals has held that a state court's summary, unexplained rejection of a constitutional issue qualifies as an adjudication that is entitled to deference at the federal level. ***Wright v. Sec'y for Dep't of Corr.***, 278 F.3d 1245, 1254 (11th Cir. 2002). All the state court must do is reject a claim on the merits; it does not have to provide an explanation for § 2254 (d)(1) to apply. ***Id.*** at 1255.

As § 2254 (d) applies, the only issues for this Court are whether the state court decision is "contrary to, or involved an unreasonable application of, clearly established Federal law," or is based on an "unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254 (d). No one disputes that the "clearly established Federal law" on the issue of ineffective assistance of counsel is ***Strickland v. Washington***, 466 U.S. 668 (1984). ***See Rutherford v. Crosby***, 385 F.3d 1300, 1308 (11th Cir. 2000)(explaining that "[t]he Supreme Court clearly established the federal law governing ineffective assistance of counsel claims in ***Strickland v. Washington***, 466 U.S. 668 (1984).")

The standard announced in ***Strickland*** is as follows:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

***Strickland***, 466 U.S. at 687.

Petitioner maintains that "[t]rial counsel's failure to investigate the state's case on this critical point and to discover the identify of the intern and present it to the jury fell below the

standard of performance we expect of trail attorney's generally" and such failure prejudiced petitioner. (Pet'r May 15, 2006 B., p. 45). Petitioner states that "[t]he state Supreme Court's legal conclusion that trial counsel was not ineffective . . . is contrary to the applicable and clearly established United State Supreme Court precedent set forth in Strickland . . . and its progeny." (Pet't May 15, 2006 Br., p. 45).

A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases." ***Williams***, 529 U.S. at 405. In this case, the Supreme Court of Georgia did not apply a rule that contradicted the governing law; it applied the clearly established Supreme Court precedent set forth in ***Strickland***. The second situation in which a state court decision is "contrary to" Supreme Court precedent occurs when "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court] precedent." ***Williams***, 529 U.S. at 406. Petitioner has not cited any Supreme Court case with "materially indistinguishable" facts in which the Supreme Court reached a different result. Given this, the Georgia Supreme Court decision is not "contrary to" ***Strickland***. ***See Wellington v. Moore,*** 314 F.3d 1256, 1260-61 (11th Cir. 2002)(explaining that " the state court, by correctly identifying ***Strickland*** as the controlling legal authority on claims of ineffective assistance of counsel, did not reach an opposite conclusion from the Supreme Court on a question of law. Further, [the petitioner] does not cite to any decision in which the United States Supreme Court, faced with materially indistinguishable facts, reached a decision different from the state court in this case." If both of these conditions are met, the state court's decision is not "contrary to clearly established federal law as determined by the United States Supreme Court.")

The next question is whether the Georgia Supreme Court applied ***Strickland*** to the facts

of this case in an objectively unreasonable manner. The Supreme Court has explained that "an unreasonable application is different from an incorrect one." ***Bell v. Cone***, 535 U.S. 685, 694 (2002). Furthermore, "a federal habeas court may not issue a writ under the unreasonable application clause 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly'." ***Id***. (quoting ***Williams***, 529 U.S. at 411(O'Connor, J., concurring)). The state court's application must be objectively unreasonable. ***See Rutherford***, 385 F.3d at 1309 (explaining that "[i]n assessing [a Petitioner's] claim that his trial counsel were ineffective we must keep in mind that 'judicial scrutiny of counsel's performance must be highly deferential.' . . . In addition to the deference to counsel's performance mandated by ***Strickland***, the AEDPA adds another layer of deference–this one to a state court's decision–when we are considering whether to grant federal habeas relief from a state court's decision. . . . [A petitioner] must do more than satisfy the ***Strickland*** standard. He must also show that in rejecting his ineffective assistance of counsel claim the state court 'applied ***Strickland*** to the facts of his case in an objectively unreasonable manner'.")(citations omitted)

Applying these stringent standards, the Court determines that the state court did not unreasonably apply ***Strickland*** to the facts in this case. Petitioner states that his counsel was ineffective because he failed, through pre-trial investigation, to learn that Kevin Smith was the individual who actually operated the metal detector. However, there was nothing in the pre-trial record that would have alerted trial counsel to the fact that someone other than the GBI crime scene specialist, Terry Cooper, operated the metal detector. Petitioner's attorney explained as follows during the May 31, 1996 hearing on Petitioner's motion for a new trial:

> The sole information in [Terry Cooper's] report regarding the metal detector is what I am about to read to you. A metal detector was utilized to search the area to the right and to the feet area in an attempt to locate spent shell casings. None were located. That's it. That's the entire information regarding the metal detector search. No mention of Kevin Smith or anybody else.

(Resp't Ex. 19, p. 27).

Therefore, while it possible that Petitioner's counsel could have interviewed Terry Cooper pre-trial and might have possibly discovered the existence of Kevin Smith, this Court certainly cannot say that the state court unreasonably applied ***Strickland*** when it found that counsel was not ineffective for failing to do so. ***See White v. Singletary***, 972 F.2d 1218 1220-21 (11th Cir. 1992)(explaining that "[t]he test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted.")

Morever, Petitioner has not established that he was prejudiced by his trial counsel's failure to located Kevin Smith and present his testimony at trial. Counsel established, through Terry Cooper and Gerald Gunthарp, that the crime scene area around Eddie Tucker's body was thoroughly searched on the day his body was located and State's Exhibit 28 (a fragment of a shotgun barrel) was not located on that day. Specifically, Terry Cooper testified that a metal detector was used to search the crime scene the day that Eddie Tucker's body was discovered. (Resp't Ex. 11, p. 1572). He testified as follows: "We began scanning the area with a metal detector and I had an intern with me and allowed him to use the metal detector. And about I would say halfway to[6] the scene the batteries went dead. Se we stopped at that time." (Resp't Ex. 11,

---

[6]There is some indication that the word "to" was a typographical error and that he actually said "through."

p. 1572).[7]

Gerald Guntharp, chief deputy with the Oconee County Sheriff's office, testified as follows at Petitioner's trial:

> A. We went inside of the roped off area and outside of the roped off area looking for anything, anything that could be connected to that scene of the crime.
>
> . . .
>
> Q. Normally you would scrutinize the area of the body lets say three or four fee out and circle around the body, and that would be an area of intense scrutiny, wouldn't it?
>
> A. Yes.
>
> Q. And you saw those officers walking around and moving leaves in that area, right?
>
> A. Yes, sir. I saw them looking very thoroughly.
>
> Q. And you saw a metal detector?
>
> A. There was one there, but I don't think that thing worked properly at the time.
>
> Q. I don't know what you think, but did you see a metal detector there?
>
> A. Yes, sir.
>
> Q. Did you see them moving it around?
>
> A. Yes, sir.
>
> Q. Did you ever hear anyone say anything about the metal detector?
>
> A. I think I heard one say that the batteries were going out on it.
>
> . . .
>
> Q. You saw those detectives moving leaves in the area of the body, didn't you?
>
> A. Yes.
>
> Q. And you saw a metal detector there, didn't you?
>
> A. Yes, sir.
>
> Q. And you think you heard somebody say something about a battery?

---

[7]Two page numbers (1571 and 1572) are actually shown on the bottom of this one page in Resp't Ex. 11.

A. I think they said something about a battery, right.

Q. You think it or do you distinctly remember that?

A. All I know is that the battery didn't function properly.

Q. Anything that was in let's say three feet of the body from what you observed would have been found, correct?

A. Well, I don't know.

Q. Well, they were down here shoving the leaves around, weren't they, looking around for bullets, casings and things, weren't they?

A. None of that was found.

Q. Well, they were looking, weren't they?

A. Right.

Q. And none of that was found. That's the very point, thank you, sir.

(Resp't Ex. 11, p. 1600-04).

This testimony of both of these officers–that the crime scene was thoroughly searched the day Tucker's body was found and the shotgun fragment was not located--supported Petitioner's theory that the shotgun fragment was planted at the crime scene some time after the initial date of the crime scene search. (Resp't Ex. 14, p. 2334-35). Kevin Smith's post-trial affidavit adds little. In this affidavit, Kevin Smith states as follows:

> A metal detector was used by the crime scene investigator and me as a part of the search of the crime scene area. The area within ten (10) feet of the body was searched visually and with the metal detector.
>
> Near the end of the day as darkness approached, the battery on the metal detector became low. At that point in time, most of the officers who had been at the scene had left. I believe that there were only three people present at that time: the GBI crime scene investigator, me, and an officer whose name I do not recall.

(Resp't Ex. 23, p. 450-51).

Petitioner simply has not shown that there is a reasonable probability that, but for his counsel's failure to locate and present this testimony of Kevin Smith, the result of his trial would have been different. ***Strickland***, 466 U.S. at at 694. Given the required deference to counsel,

coupled with deference to the state court's decision, this Court finds that the Georgia Supreme Court's application of ***Strickland*** to the facts in this case was not objectively unreasonable; nor was the state court's decision based on an unreasonable determination of the facts.

**4. Claim Seven: Petitioner's right to due process, protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, were violated when the trial court admitted prejudicial and inflammatory evidence of Petitioner's putative racism and Klan affiliation.**

The Georgia Supreme Court ruled as follows on this issue:

> Mize complains that the State introduced inflammatory, irrelevant evidence about Mize's racist beliefs and Ku Klux Klan affiliation in an attempt to prejudice the jury. At trial, several witnesses testified about the racist goals and beliefs of Mize and the NVAP. Photographs of items seized from Mize's home, such as flags bearing the NVAP or Klan insignia, a racist poster, a Klan belt buckle, and a cross with NVAP symbols, were admitted into evidence. Normally, evidence concerning a defendant's political or racial beliefs is irrelevant to a determination of guilt or innocence. O.C.G.A. § 24-2-2. Under the facts of this case, however, the evidence was admissible because it explained Mize's motive for the murder and his bent of mind. The evidence at trial showed that Mize, as leader of a small Klan-like organization, ordered and participated in Tucker's murder because Tucker had failed to follow Mize's orders to burn a crack house. "'Evidence that is otherwise relevant and material to the issues in a criminal case does not become inadmissible simply because it incidentally puts a defendant's character or reputation into evidence.'" Boutwell v. State, 256 Ga. 63 (2) (344 S.E.2d 222) (1986), quoting Daniels v. State, 252 Ga. 30 (6) (310 S.E.2d 904) (1984); Earnest v. State, 262 Ga. 494 (1) (422 S.E.2d 188) (1992) (evidence of defendant's involvement in satanic cult admissible to show motive). The State had to present evidence of Mize's Klan affiliation and position within the NVAP in order to show his motive for the murder and his role in the killing.

***Mize***, 269 Ga. at 650.

Petitioner states that "[t]he state court ruling resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law because the state court reached a different conclusion than applicable Supreme Court precedent on substantially similar

facts." (Pet't May 15, 2006 Br., p. 58). It is true that a state court's decision is contrary to Supreme Court precedent "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." ***Williams,*** 529 U.S. at 405. However, such is not the situation in the current case.

Petitioner points to five Supreme Court cases: ***Lisenba v. State of California***, 314 U.S. 219 (1941); ***Dennis v. United States***, 339 U.S. 162 (1950); ***Shepard v. United States***, 290 U.S. 96 (1933); ***Beck v. Alabama***, 447 U.S. 625 (1980); and ***Gardner v. Florida***, 430 U.S. 349 (1977). However, the Court finds that the facts in these cases are not remotely similar, much less "materially indistinguishable," from those in the present case. Moreover, the state court's ruling in this case regarding the admissibly of petitioner's putative racism and Klan affiliation is not opposite to the holdings reached by the United States Supreme Court in any of these cases.[8]

---

[8]In ***Lisenba***, the issue on appeal was whether the defendant's confession was the result of coercion and compulsion and should have, therefore, been excluded from his trial. The Supreme Court held the confession was properly admitted into evidence. ***Lisenba***, 314 U.S. at 238-39. In ***Dennis***, the issue was whether "a challenge for cause to jurors on *voir dire* because of employment by the Federal government should have been sustained." ***Dennis***, 339 U.S. at 164. The Court held that a government employee is not automatically disqualified from serving as a juror in a case in which a member of the Communist Party is tried for contempt of a congressional committee. ***Id.*** at 172. In ***Shepard***, the facts involved a dying declaration and the issue was the admissibility of such a declaration when the State failed to establish that the declarant spoke without hope of recovery. ***Shepard***, 290 U.S. at 101-06. In ***Beck***, the only issue was whether a sentence of death constitutionally can be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported a verdict of guilt of a lesser non-capital offense. ***Beck***, 447 U.S. at 626. Finally, the facts in ***Gardner*** had nothing in common with those in the current case and in ***Gardner*** the Court held that a defendant is denied due process when he is sentenced to death on the basis of information contained in a pre-sentence investigation report that was not disclosed to the defendant or his counsel. ***Gardner***, 430 U.S. at 351.

Petitioner has simply failed to show that the state court's holding is contrary to clearly established federal law. In fact, the United States Supreme Court has repeatedly explained that the introduction of evidence that might adversely reflect the actor's character is permissible if the evidence bears upon a relevant issue in the case (such as motive, bent of mind, or plan, as the state court found in this case) and its probative value outweighs its prejudicial impact. ***See United States v. Felix***, 503 U.S. 378 (1992); ***Huddleston v. United States***, 485 U.S. 681 (1988); ***United States v. Abel***, 469 U.S. 45 (1984).

Given this, the state court's decision on this issue was no contrary to, or an unreasonable application, of any clearly established federal law; nor has Petitioner in any way shown that the state court's decision based on an unreasonable determination of the facts. Therefore, the Court must deny federal habeas corpus relief on this claim.

**5. Claim Eight: Petitioner's rights to due process, protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, were violated when the trial court allowed a states's witness to serve as a bailiff for the sequestered jury, thereby rendering him functionally unavailable to the defense to impeach another state's witness.**

The Supreme Court of Georgia held as follows regarding this issue:

> Mize contends that the trial court erred by allowing Deputy William Ricketts to serve as a bailiff during Mize's trial. Mize claims that he needed to call Deputy Ricketts as a witness for impeachment purposes but could not do so because the deputy had formed a close relationship with the jury. Before trial, Mize moved to prevent any Oconee County deputies from serving as bailiffs during the trial. At a pre-trial hearing, Deputy Ricketts testified that his only role in the case was to provide security for a few hours on the road adjoining the crime scene. He never actually went into the woods to the crime scene, and was not involved in the investigation of the case. The State told the trial court that it did not intend to call Deputy Ricketts as a witness. The trial court ruled that Deputy Ricketts would serve as a bailiff because Deputy Ricketts was a certified EMT and the trial court wanted someone with medical training to be with the jury.
>
> At trial, Investigator Ed Norman of the Oconee County Sheriff's

> Department testified that GBI Agent Cooper told him that the metal detector's batteries had died, but Investigator Norman's report stated that it was Deputy Ricketts who told him about the dead batteries. Mize claims that he needed to call Deputy Ricketts to impeach Investigator Norman, and that this dilemma should have resulted in a mistrial, which the trial court denied. We disagree with Mize's contention. First, Investigator Norman could have been impeached with his own written report. Second, nothing prevented Mize from calling Deputy Ricketts for the purpose of impeaching Investigator Norman. Mize points to Radford v. State, 263 Ga. 47 (426 S.E.2d 868) (1993), and Turner v. Louisiana, 379 U.S. 466 (85 S. Ct. 546, 13 L. Ed. 2d 424) (1965), to support his claim that Mize's conviction must be reversed due to his need to call a bailiff as a witness. These cases do not support his argument, though, because they each involved bailiffs who were called as key witnesses for the prosecution. For example, in Radford, supra, a bailiff was called by the State and he testified that he was the first officer to respond to the scene of the crime, that he obtained a description of the defendant and his car from the victim's sister, and that he subsequently staked out the defendant's residence and observed some suspicious behavior. Radford, supra at 48-49. In Mize's case, the bailiff was never called as a State witness, and his involvement in the case was extremely minor. In fact, the rationale behind reversing the convictions in Radford and Turner, that the jury would tend to favor a witness with whom they had formed a bailiff-juror relationship, would seem to work in Mize's favor were he to call Deputy Ricketts to impeach Investigator Norman. We conclude that Mize suffered no prejudice from Deputy Ricketts serving as a bailiff in this case.

***Mize***, 269 Ga. at 650-51.

As the state court adjudicated this claim on the merits, to obtain relief Petitioner must show that the state court's decision was "contrary to, or . . . an unreasonable application of, clearly established" United States Supreme Court precedent, or "based on an unreasonable determination of the facts in light of the evidence." 28 U.S.C. § 2254 (d). Petitioner states that the applicable Supreme Court precedent is ***Turner v. Louisiana***, 379 U.S. 466 (1965) and ***Gonzalez v. Beto***, 405 U.S. 1052 (1972). Furthermore, petitioner maintain that the Georgia Supreme Court erroneously held that ***Turner*** was distinguishable from the present case and, "therefore the state court erred because it reached a different conclusion than applicable Supreme Court precedent on substantially similar facts." (Pet'r May 15, 2006 Br., p. 66).

However, the facts in ***Turner*** are not substantially similar to the facts in the present case. In Turner, "two principal witnesses for the prosecution at trial" were deputy sheriffs who "described in detail" the murder scene investigation, the apprehension of Turner, and Turner's confession. ***Turner***, 379 U.S. at 467. Turner's trial lasted three days and the jury was sequestered during this time. ***Id***. at 467-68. During this sequestration, these same two deputy sheriffs were continuously in the company of the jury. ***Id***. at 468. "The deputies drove the jurors to a restaurant for each meal, and to their lodgings each night. The deputies ate with them, conversed with them, and did errands for them." ***Id***. Furthermore, testimony showed that both of the deputies had "freely mingled and conversed with the jurors in and out of the courthouse during the trial." ***Id.*** However, the trial court refused to grant a mistrial because "there was no showing that either deputy had talked with any member of the jury about the case itself." ***Id***. at 469. The Supreme Court of Louisiana upheld the trial court's ruling. However, the United States Supreme Court disagreed and explained as follows:

> In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the "evidence developed" against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel. What happened in this case operated to subvert these basic guarantees of trial by jury. It is to be emphasized that the testimony of [the two deputies] . . . was not confined to some uncontroverted or merely formal aspect of the case for the prosecution. On the contrary, the credibility which the jury attached to the testimony of these **two key witnesses** must inevitably have determined whether Wayne Turner was to be sent to his death. To be sure, their credibility was assailed by Turner's counsel through cross-examination in open court. But the potentialities of what went on outside the courtroom during the three days of the trial may well have made these courtroom proceedings little more than a hollow formality. . . .
>
> It is true that at the time they testified in open court [the two deputies] . . . told the trial judge that they had not talked to the jurors about the case itself. But there is nothing to show what the two deputies discussed in their conversations with the jurors thereafter. And even if it could be assumed that the deputies never

> did discuss the case directly with any members of the jury, it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these **two key witnesses** for the prosecution.

***Id***. at 472-73 (emphasis added).

The facts in ***Gonzales v. Beto***, 405 U.S. 1052 (1972) are similar to those in ***Turner***. In ***Gonzales***, "[t]he prosecution's case against the petitioner rested almost totally upon the testimony of the county sheriff." ***Id***. at 1052. "The county sheriff . . . played a dual role at the trial, for he was not only the key prosecution witness against the petitioner, but the bailiff of the jury as well." ***Id.*** at 1052-53. During the one-day trial, the sheriff freely conversed with the jurors on the way to lunch, ate with them, and fulfilled any requests they had during their deliberations. ***Id.*** at 1053.

The Supreme Court of the United States explained as follows:

> ***Turner***, of course, did not set down a rigid, per se rule automatically requiring the reversal of any conviction whenever any Government witness comes into any contact with the jury. The Court's opinion specifically indicated that association with the jury by a witness whose testimony was "confined to some uncontroverted or merely formal aspect of the case for the prosecution" would hardly present a constitutional problem. [***Turner***, 379 U.S. at 473]. And it indicated that a mere "brief encounter," by chance, with the jury would not generally contravene due process principles. ***Ibid.*** For, as pointed out in dissent today, certain chance contacts between witnesses and jury members, while passing in the hall or crowded together in an elevator, are often inevitable.
>
> But the Court in ***Turner*** was not dealing with just any prosecution witness coming into any contact with the jury. Rather, it was dealing with **crucial witnesses against the defendant** who associated with the jurors as their official guardians throughout the trial. Turner established the simple principle that association of that particular sort cannot be permitted if criminal defendants are to be afforded due process of law.
>
> At the heart of our holding in ***Turner*** lay a recognition of the great prejudice inherent in the dual role of jury bailiff and **key prosecution witness**....
>
> When a **key witness against a defendant** doubles as the officer of the court specifically charged with the care and protection of the jurors, associating with them on both a personal and an official basis while simultaneously testifying for the prosecution, the adversary system of justice if perverted.

***Gonzales***, 405 U.S. at 1055 (emphasis added).

In both ***Turner*** and ***Gonzales***, the Supreme Court held that it is violation of the Fourteenth Amendment for a key prosecution witness to act as a bailiff. However, in the current case, Deputy Ricketts did not even testify for the State. Moreover, unlike the two deputies in ***Turner*** and Sheriff in ***Gonzales***, it appears that Deputy Ricketts' "involvement in the case was extremely minor." ***Mize***, 269 Ga. at 650. Finally, had the defense called Deputy Ricketts to testify regarding the batteries in the metal detectors, his testimony would not have been in conflict with Petitioner's theory of the case. Instead, he could have been used to impeach a State's witness and, therefore, support Petitioner's defense.

Given these differences from the facts presented in ***Turner*** and ***Gonzales***, the Court cannot find that "the state court confront[ed] facts that [were] materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a result opposite to [the Supreme Court]." ***Williams***, 529 U.S. at 405. Therefore, the Georgia Supreme Court decision was not contrary to applicable Supreme Court precedent; nor was the state court's decision on this issue an "unreasonable application of clearly established Federal law." 28 U.S.C. § 2254 (d)(1). Finally, Petitioner does not argue that the state court's conclusion is based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding" and this Court does not find such to be the case. 28 U.S.C. § 2254 (d)(2). Therefore, federal habeas corpus relief on this claim is denied.

**6. Claim Nine: Petitioner's right to due process, protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, was violated when the trial court refused to strike for cause potential juror Hunsinger who expressed a bias in favor of**

**the state against the defense.[9]**

**7. Claim Ten: Petitioner's right to due process, protected by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, was violated when the trial court refused to strike for cause potential jurors Miller and Cutler who both indicated a willingness to shift the burden of proof to the defense.**

**8. Claim Eleven: Petitioner's right to due process, protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, was violated when the trial court refused to strike for cause potential juror Rice who expressed a bias against the defense based upon Klan membership.**

Examination of the trial transcript shows that petitioner tried to have jurors Mary Helen Hunsinger, Jo Lynn Miller, Joanne Cutler, and Thomas Russell Rice excused for cause. (Resp't Ex. 6, p. 138-65, 271-87; Resp't Ex. 7, p. 387-402; Resp't Ex. 8, p. 674-705). However, the trial court refused to disqualify these potential jurors. Thereafter, petitioner's attorneys used their preemptive strikes to strike each one of these individuals. (Resp't Ex. 23, p. 403-405). None of these four individuals actually served on the jury that convicted and sentenced petitioner.[10] (Res't Ex. 10, p. 1420). None of the twelve jurors (or four alternates) who actually sat and decided Petitioner's fate were challenged for cause by Petitioner's counsel. (Resp't Ex. 6-10).

The Georgia Supreme Court upheld the trial court's refusal to disqualify these four jurors and held as follows:

> (a) *Juror Hunsinger*. Mize claims that Juror Hunsinger knew several of the law enforcement witnesses on the State witness list and was biased in favor of

---

[9]Claims Nine, Ten, and Eleven will be addressed together.

[10]Apparently, there were two potential jurors with the last name Rice. An individual named Kelly Rice did serve as an alternate juror. However, petitioner sought to have Thomas Russell Rice (not Kelly Rice) disqualified; and Petitioner now argues that the trial court's failure to exclude Thomas Russell Rice (again, not Kelly Rice) violated petitioner's right to due process. Thomas Russell Rice did not serve on the petitioner's jury.

the prosecution. She stated that she had gone to high school with two of the witnesses, and that she had met another State witness because of her son's traffic violations. But she also stated that she had never been close friends with any of the witnesses, and that she had had very little contact with them in the previous decade (she had talked with one of her high school friends four times in the past eleven years). Even though Juror Hunsinger stated that she would be "hard pressed" to believe that the State witnesses whom she knew would fabricate evidence, she repeatedly and firmly stated that she would judge the credibility of the witnesses and the guilt of the defendant based on the evidence and the trial court's instructions. Whether to strike a juror for cause lies within the sound discretion of the trial court and the trial court did not abuse its discretion by denying the motion to strike Juror Hunsinger. ***Brown v. State***, 268 Ga. 354 (1997); ***Foster v. State***, 248 Ga. 409 (1981) (fact that juror has formed an opinion about the credibility of a witness does not mandate that the juror be excused for cause).

(b) *Jurors Miller and Cutler*. Mize claims that these jurors should have been struck for cause because they believed that the defense had a burden to produce evidence of Mize's innocence. It is apparent from the voir dire transcript that these jurors were confused about the State's burden to prove the defendant guilty beyond a reasonable doubt because they had not yet received any legal instruction from the trial court. When apprised that the State had the burden of proof and the defense did not need to produce any evidence, both jurors stated that they could adhere to this principle in their consideration of the case. The trial court did not abuse its discretion by refusing to strike these jurors for cause. ***Brown, supra***.

. . . .

(e) *Juror Rice*. Mize complains that Juror Rice should have been excused for cause because he had negative feelings about the Ku Klux Klan that prevented him from being impartial. During voir dire, Juror Rice stated that he had personal feelings against the Klan and that he might not consider a member of the Klan to be as credible as another witness. Upon further questioning, Juror Rice stated that he had previously misstated and that he would not disbelieve someone just because they were in the Klan. He testified that he was against all kinds of hate groups, but that he would not apply his personal feelings when listening to the evidence. He further stated that Mize was presumed innocent and that he would follow the trial court's instructions. The trial court did not manifestly abuse its discretion by concluding that Juror Rice was able to lay aside his opinion concerning the Klan and render a verdict based on the evidence presented in court. ***See Diaz v. State***, 262 Ga. 750(1993); ***Irvin v. Dowd***, 366 U.S. 717, 723 (1961).

***Mize***, 269 Ga. at 651-53.

These determinations by the Georgia Supreme Court are not contrary to, or an unreasonable

application of, well established federal law. ***See Irvin v. Dowd***, 366 U.S. 717 (1961); ***Wainwright v. Witt***, 469 U.S. 412 (1985). Additionally, the question of individual juror bias is a question of fact. ***Patton v. Yount***, 467 U.S. 1025, 1036 (1984). Therefore, under 28 U.S.C. § 2254(e)(1), the state trial court's findings are entitled to a presumption of correctness and Petitioner has the burden of rebutting this presumption by clear and convincing evidence. In this case, Petitioner has failed to present clear and convincing evidence that the trial court's factual determinations regarding the impartiality of the jurors were incorrect.

Petitioner complains that the trial court improperly rehabilitated "apparently biased jurors." (Pet'r May 15, 2006 Br., p. 76). However, Petitioner admits that there is "no United States Supreme Court opinion [that] interprets the Sixth Amendment's guarantee of a fair and impartial jury by considering this common practice of judicial rehabilitation of jurors." (Pet'r May 15, 2006 Br., p. 75-76). As explained above, when there is no Supreme Court precedent on point, "'the court cannot say that the state court's conclusion . . . is contrary to clearly established federal law as determined by the United States'." ***Henderson v. Haley***, 353 F.3d 880, 890 (11th Cir. 2003)(quoting ***Isaacs v. Head***, 300 F.3d 1232, 1252 (11th Cir. 2002)).

Moreover, the four prospective jurors about which petitioner complains did not sit on his jury. Petitioner does not suggest that any of the twelve jurors who actually sat on his case were biased or impartial. "Any claim that the jury was not impartial . . . must focus . . . on the jurors who ultimately sat." ***Ross v. Oklahoma***, 487 U.S. 81, 86 (1988). Even if the trial court erred in its failure to disqualify these four jurors (which this Court does not hold to be the case), Petitioner exercised his peremptory challenges and removed them "from the jury as effectively as if the trial court had excused [them] for cause." ***Id***. at 86. The loss of a peremptory challenge does not

constitute a violation of the constitutional right to an impartial jury. ***Id.*** at 88. "[T]here is no constitutional violation where the biased veniremember does not eventually sit on the jury." ***Heath v. Jones***, 941 F.2d 1126,1132-33 (11th Cir. 1991)(explaining that "[t]he Court in ***Ross*** held that a habeas petitioner's constitutional rights were not violated when he was forced to waste a peremptory challenge to remove a veniremember whom the court should have removed for cause. Therefore, in [a] habeas petition, [a petitioner] can raise only the trial court's denials of [his] challenges for cause of those veniremembers who eventually sat on the jury.")

Based on the above, federal habeas corpus relief on this claim must be denied.

**C. Miscarriage of justice due to actual innocence**.

The United States Supreme Court has explained that when a Petitioner maintains that a miscarriage of justice due to "actual innocence" will result from a district court's failure to review a procedurally defaulted claim, the court "must first address all nondefaulted claims for comparable relief and other grounds for cause to excuse the procedural default." ***Dretke v. Haley***, 541 U.S. 386, 394 (2004). "This sequencing requirement was designed by the Supreme Court as a means of avoiding the 'threshold legal questions that often accompany claims of actual innocence' when a default can be excused on some simpler ground or full relief can be granted on a nondefaulted ground." Randy Hertz & James S. Liebman, ***Federal Habeas Corpus Practice and Procedure*** § 26.4 (5th ed. 2005)(quoting ***Dretke***, 541 U.S. at 394).

In his "Brief Regarding Exhaustion, Procedural Default, Cause and Prejudice, and Fundamental Miscarriage of Justice for claims Two, Four, Five, and Six of the Amended Petition for Writ of Habeas Corpus," Petitioner maintained and argued that the Courts failure to review the

procedurally defaulted claims (particularly Claim Two) would result in a fundamental miscarriage of justice due to Petitioner's "actual innocence." (R. at 80). In its March 15, 2006 Order, the Court explained that, pursuant to ***Dretke***, it would review this issue, if necessary, after it "address[ed] all nondefaulted claims for comparable relief." ***Dretke***, 541 U.S. at 394. The Court has now denied habeas relief on all nondefaulted claims. Therefore, the Court must now addresses the issue of fundamental miscarriage of justice based on Petitioner's claimed "actual innocence."[11]

In ***Murray v. Carrier***, 477 U.S. 478 (1986), the Supreme Court of the United States "recognized a narrow exception to the cause requirement where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offence." ***Dretke***, 541 U.S. at 393 (quoting ***Murray***, 477 U.S. at 496). In ***Sawyer v. Whitley***, 505 U.S. 333 (1992), the Court "extended this exception to claims of capital sentencing error." ***Dretke***, 541 U.S. at 393.

In a recent case, the Court elaborated on the "actual innocence" exception to the procedural default rule. ***House v. Bell***, 126 S. Ct. 2064 (2006). The Court explained that "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt'." ***House v. Bell***, 126 S. Ct. 2064, 2076-77 (2006)(quoting ***Schlup v. Delo***, 513 U.S. 298, 327 (1995)). Such a claim requires "new reliable evidence" and the standard is "demanding and

---

[11]Petitioner briefed this issue in his "Brief Regarding Procedural Default, Cause and Prejudice, and Fundamental Miscarriage of Justice for Claims Two, Four, Five, and Six of the Amended Petition for Writ of Habeas Corpus." (R. at 80). Respondent briefed this issue in his "Response to Petitioner's Brief on Procedural Default and Exhaustion." (R. at 81).

permits review on in the 'extraordinary' case." ***Id***. at 2077 (quoting ***Schlup*** , 513 U.S. at 327).

In this case, Petitioner simply has not presented "new reliable evidence" of his innocence. Taking into consideration all of the briefs, and evidence that was presented during post-trial state proceedings,[12] the Court finds that Petitioner has not shown "actual innocence" to overcome any procedural defaults.

## III. CONCLUSION

Based on the above, the Court **DENIES** Petitioner's Petition for Writ of Habeas Corpus By a Person in State Custody.

**SO ORDERED**, this 16 day of November, 2006.

DUROSS FITZPATRICK
UNITED STATES DISTRICT JUDGE

lnb

---

[12]Petitioner states that "Samantha Doster's recantation of critical trial testimony should have resulted in the reversal of Mize's conviction." (Pet'r January 12, 2006 Br., p. 27). However, at the state level, Petitioner failed to develop the evidence surrounding this recantation; although he had numerous opportunities to do so. For a complete discussion regarding Petitioner's lack of diligence in presenting such evidence, see this Court's July 29, 2005 Order denying Petitioner's motion to hold proceedings in abeyance pending exhaustion, and its December 12, 2005 Order denying an evidentiary hearing. Because Petitioner was not diligent in developing such evidence at the state level, 28 U.S.C. § 2254(e)(2) does not allow him to develop the factual basis of such claims during these federal proceedings.